Nelson VIART Plaintiff

v.

BULL MOTORS, INC. Defendant

No. 99–1961–CIV.

United States District Court,
S.D. Florida,
Miami Division.

June 28, 2001.

Jamie H. Zidell, Miami Beach, FL, for Plaintiff.

Mark T. Kobelinski, Coral Gables, FL, for Defendant.

### AMENDED ORDER GRANTING MOTION FOR JUDGMENT AS A MATTER OF LAW

JORDAN, District Judge.

Nelson Viart sued his former employer, Bull Motors, for violations of the overtime and retaliation provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 201–216. Bull Motors argued that Mr. Viart was exempt from the overtime provisions of the FLSA, and that it had not retaliated against him. After a four-day trial, the jury returned a verdict for Mr. Viart on both claims.

At the close of Mr. Viart's case, Bull Motors timely moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 on Mr. Viart's overtime claim, and I reserved ruling on the motion. For the following reasons, Bull Motor's renewed motion for a Rule 50 judgment [D.E. 111] is GRANTED.

### I. THE RULE 50 STANDARD

The standard for granting a motion for judgment as a matter of law under Rule 50 "mirrors" the standard for granting summary judgment under Rule 56. *See Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 149–150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250–51, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). A motion for judgment as a matter of law requires the consideration of " 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.' " *Davis v. Town of Lake Park,* 245 F.3d 1232, 1237 (11th Cir.2001) (citing *Liberty Lobby,* 477 U.S. at 251–52, 106 S.Ct. 2505). If substantial evidence exists in opposition to a motion for judgment as a matter of law, such that reasonable people, exercising impartial judgment, could reach different conclusions, then the motion must be denied. *See id.* I must consider the evidence and inferences in the light most favorable to Mr. Viart, the non-moving party. *See Reeves,* 530 U.S. at 150, 120 S.Ct. 2097; *Davis,* 245 F.3d at 1237 (citing *Carter v. City of Miami,* 870 F.2d 578, 581 (11th Cir.1989)).

### II. THE RELEVANT FACTS

Bull Motors employed Mr. Viart as a "pre-delivery inspection technician." Mr. Viart was certified by Ford as a PDI technician, and he worked only on new Ford cars and trucks. Ford's policy is to condition coverage of warranty repairs on Bull Motors employing certified PDI technicians. Bull Motors uses a Ford PDI 46–point checklist[1] that the PDI technicians fill out for every car they inspect. Ford distributes service bulletins for all technicians, including some aimed at PDI technicians. PDI technicians are not supposed to perform mechanical repairs, but some of their duties—such as inspecting for engine leaks and testing the brakes—overlap with those of the service technicians.

As a PDI technician, Mr. Viart's duties included checking the air conditioning, battery, and steering of each new car; checking and refilling the car's fluids; checking the interior of the car (e.g., the lights,

---

1. A copy of the checklist, which was intro-  duced at trial, is attached to this order.

gauges, locks, mirrors, windows, and seats); and driving the car four to five miles to ensure proper operation. Although Mr. Viart was responsible for installing any accessories in the cars, during the last three years he was at Bull Motors most accessories were pre-installed. Mr. Viart also attached the license plates and appropriate dealership stickers to the cars, and ensured proper door and hood adjustments. Mr. Viart used keys, wrenches, and electric and battery-powered tools—which he bought himself—to complete these tasks. Mr. Viart estimated that he spent an average of approximately 30–40 minutes inspecting each car. Of these minutes, 15–20 were spent test driving the car.[2]

Mr. Viart's duties did not include washing or polishing cars, and the employees who worked washing and polishing the cars were not certified as PDI Technicians. Primarily, Mr. Viart simply worked through all 46 items in the PDI checklist. Bull Motors did not employ Mr. Viart as a service technician—a repair mechanic—and he was not supposed to perform any mechanical repairs on the cars. If any mechanical repairs were needed in the engine or the interior, Mr. Viart would report the problem to his supervisor, or he would take the car to the service department. Because the vast majority of the new cars he inspected were in good mechanical shape, there was rarely any need for any sort of repairs.

Mr. Viart generally worked six days per week. He arrived at work at 6:00 a.m. and would stay until late afternoon or early evening, depending on the number of cars that need pre-delivery inspections. If no cars needed such inspections, Mr. Viart would leave around 1:00 or 2:00 p.m., but would remain available until 5:00 p.m. When he left, Bull Motors required

(through Mr. Viart's supervisor, Pedro Blanco) only that Mr. Viart return to the dealership promptly if he was needed. Mr Viart was not required to stay at home, however, and was free to be anywhere he chose as long as he responded when notified. When he was called in on these occasions, Mr. Viart would return to Bull Motors within 10 or 15 minutes. Including so-called "waiting time," Mr. Viart usually worked more than 40 hours a week. Generally, Mr. Viart worked very independently.

Bull Motors paid Mr. Viart a flat or "flag" rate for each car he inspected, no matter how long it took him to complete the inspection. Mr. Viart's rate was $10 per car, and his annual salary from 1996 to 1999 was between $35,000 and $37,000. Bull Motors did not pay Mr. Viart overtime wages for weeks in which he worked more than 40 hours.

### III. THE MECHANICS' EXEMPTION IN 29 U.S.C. § 213(b)(10)(A)

■ Bull Motors argues that no reasonable juror could have found that Mr. Viart was outside the scope of the mechanics exemption contained in 29 U.S.C. § 213(b)(10)(A). That section provides that mechanics "primarily engaged in ... servicing automobiles" employed by "a nonmanufacturing establishment primarily engaged in the business of selling such vehicles [ ] to ultimate purchasers" are exempt from the overtime requirements of the FLSA. This exemption, like other FLSA exemptions, is to be narrowly construed. *See, e.g., Auer v. Robbins,* 519 U.S. 452, 462, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997) (citing *Arnold v. Ben Kanowsky, Inc.,* 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960)); *Freeman v. City of Mobile,* 146 F.3d 1292, 1297 (11th Cir.1998) (citation omitted). *See also Shultz v. Lou-*

---

**2.** Mr. Viart did not always need 30–40 minutes to inspect a car. Mr. Viart testified that

he could complete some inspections in 15–20 minutes.

*isiana Trailer Sales, Inc.,* 428 F.2d 61, 65–67 (5th Cir.1970) (holding that employees of a mobile home dealer who converted trailers into permanent residences were not mechanics primarily engaged in servicing trailers for purposes of the overtime exemption in § 213 because exemptions from the FLSA's overtime provisions must be narrowly construed).

■ The determination of whether a given employee falls within the scope of a FLSA exemption, while based on the underlying facts, is ultimately a legal question. *See Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 713–14, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986). *See also Evans v. McClain of Ga., Inc.,* 131 F.3d 957, 965–66 (11th Cir.1997) (reversing summary judgment for the employer because material issues of fact existed as to whether the employee was exempt from the FLSA's overtime provisions); *Smith v. City of Jackson,* 954 F.2d 296, 298 (5th Cir.1992) (explaining that while the factual circumstances are critical, the question of whether an employee is exempt under the FLSA is ultimately a legal one); *Mitchell v. City Ice Co.,* 273 F.2d 560, 562 (5th Cir.1960) (holding that factual disputes surrounding whether an employee was exempt should be resolved by a jury). Bull Motors relies on several sources to support its position that Mr. Viart is, as a matter of law, an exempt employee.

■ First, Bull Motors points to the regulations promulgated by the Secretary of the Department of Labor, who is charged under 29 U.S.C. § 204 with administering the FLSA. These regulations set out the criteria for various FLSA exemptions. *See* 29 C.F.R. § 779.300 *et seq.* (Chapter V, Subpart D). One of those regulations defines a mechanic, as that term is used in § 213(b)(10), as

any employee primarily engaged in doing mechanical work (such as get ready mechanics, automotive, truck, farm implement, or aircraft mechanics, used car reconditioning mechanics, and wrecker mechanics) in the servicing of an automobile, trailer, truck, farm implement, or aircraft for its use and operation of such. This includes mechanical work required for safe operation as a vehicle, farm implement, or aircraft. The term does not include employees primarily performing such non-mechanical work as washing, cleaning, painting, polishing, tire changing, installing seat covers, dispatching, lubricating, or other non-mechanical work.

29 C.F.R. § 779.372(c)(3) (2000). The regulation's inclusion of a "get-ready mechanic" within the mechanics' exemption would seem to embrace an employee like Mr. Viart. Because Congress has not "directly spoken to the precise question at issue" by defining the term mechanic, I must sustain the Secretary's approach, as reflected by the regulation, so long as it is "based on a permissible construction of the statute." *Auer,* 519 U.S. at 457, 117 S.Ct. 905; *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). I see no reason, and Mr. Viart has not offered one, to find that the Secretary's approach is based on an invalid construction of the statute. *See United States v. Mead Corp.,* —— U.S. ——, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) ("[A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and the agency interpretation claiming deference was promulgated in the exercise of that authority.").

Second, Bull Motors points to the definition of "New–Car Get Ready Mechanic" contained in the Department of Labor's Dictionary of Occupational Titles. The

Dictionary defines a "get-ready mechanic" as one who

> [i]nspects and services new automobiles on delivery to dealer or customer, and makes minor repairs or adjustments to place vehicle in salable condition, using handtools, portable power tools, and specification sheets: [sic] Inspects vehicle for obvious damage and missing major components. Records discrepancies and signs acceptance slip for each vehicle delivered. Inspects vehicle for loose or misaligned items, such as trim, doors, and hardware, and positions defective items according to specifications, using handtools. Starts engine and drives automobile to test steering, brakes, transmission, and engine operation. Activates power equipment, such as electric windows, seats, radio, horn, lights, and directional signals to ensure specified operating standards. Washes car and vacuums interior. Inspects surfaces to detect minor chips and scratches in paint and touches up imperfections, using brush applicator and factory-supplied matching paint. Installs optional equipment specified by customer or dealer, such as outside mirrors, rugs, and seat covers, using handtools. Installs standard components, such as hubcaps and wiper blades, using handtools. Pours antifreeze into radiator according to seasonal requirements. Polishes car to remove preservative coating and road film accumulated during transit. May spray undercoating material on vehicle, using spray gun. May tune engine, using mechanic's tools and test equipment. May install or repair major mechanical, hydraulic, or electromechanical equipment, such as radios, air-conditioners, power steering units, and power brakes, using mechanic's handtools.

U.S. DEP'T OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES § 806.361.026 (4th ed.1991). This definition is not specifically tied to the regulation or the statutory exemption, but the only regulation which refers to a get-ready mechanic is § 779.372(c)(3). Moreover, although the definition is not controlling, *see Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944), I should defer to it unless it is based on an impermissible construction of the statute. *See Mead Corp.*, —— U.S. at ——, 121 S.Ct. at 2164 ("[A]n agency's interpretation may merit some deference whatever its form, given the 'specialized experience and broader investigations and information' available to the agency, and given the value of uniformity in its administrative and judicial understandings of what a national law requires.") (citations omitted). *See also Auer*, 519 U.S. at 462–63, 117 S.Ct. 905; *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778.

Third, Bull Motors points to the legislative history of the mechanics' exemption. The legislative history indicates that the exemption was intended to apply to employees of automobile dealers who traditionally worked on a commission basis. *See* 112 CONG. REC. 11289 (daily ed. May 24, 1966). As the Former Fifth Circuit explained, in finding that an automobile dealer's service salesmen were within the scope of the exemption,

> service salesmen are functionally similar to the mechanics and partsmen who service the automobiles. All three work as an integrated unit, performing the services necessary for the maintenance of the customer's automobile. The mechanic and partsman provide a specialized service with the service salesman co-ordinating these specialties. Each of these service employees receive a substantial part of their remuneration from commissions and therefore are more concerned with their total work product than with the hours performed.

*Brennan v. Deel Motors, Inc.*, 475 F.2d 1095, 1097 (5th Cir.1973). Likewise, get ready mechanics such as Mr. Viart, functioning within this unit, are paid on a commission basis, and are therefore more concerned with their total output than with hours worked.

I am mindful of, and agree with, Mr. Viart's contention that dealership employees do not come within the mechanics' exemption simply because they are called "get-ready mechanics." *See Shultz*, 428 F.2d at 67 n. 10 ("We do not agree that all get-ready work comes under the exemption. If the phrase modifies the type of mechanical work performed on trailers which is performed by other mechanics on automobiles, trucks, farm implements, or aircraft, such work is exempted."). *Shultz*, however, discusses the applicability of the exemption to certain employees of a mobile-home dealer who were primarily engaged in converting mobile homes to residences, *id.* at 65–67, and the relevant regulation issued by the Secretary of Labor specifically excludes from the scope of the exemption any employees performing this type of work. *See* 29 C.F.R. § 779.372(c)(3) (citing *Shultz*, 428 F.2d at 61; *Snell v. Quality Mobile Home Brokers*, 424 F.2d 233 (4th Cir.1970)). On the other hand, by exempting get-ready work, the regulation embraces the type of labor performed by Mr. Viart. To adopt Mr. Viart's argument would require reading the term "get-ready" out of the regulation, as well as ignoring the dictionary definition of the term. Under the circumstances, neither of those results is warranted. *See Auer*, 519 U.S. at 457, 117 S.Ct. 905; *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778.

I do not agree with Mr. Viart that the § 213(b)(10)(A) exemption is inapplicable unless the employee performs mechanical work or repairs of the type normally performed by service technicians. The predelivery inspections Mr. Viart performed were mechanical within the meaning of § 213(b)(10)(A), as interpreted by the Secretary of Labor, and he performed them for the purpose of servicing the cars for their use as cars. *See Snell*, 424 F.2d at 235 ("Thus, while Snell was servicing the mobile homes on his employer's lot and preparing them for sale, the Secretary and Snell concede that he was a get-ready mechanic within the meaning of the exemption.") (citing Dictionary of Occupational Titles).

## IV. CONCLUSION

While I am cognizant of the jury's verdict, and readily admit that this is not an easy call to make, I find that as a matter of law Mr. Viart was exempt under § 213(b)(10)(A) from the overtime requirements of the FLSA. Mr. Viart seems to be the type of employee contemplated by the mechanics' exemption, the applicable regulation, and the Dictionary of Occupational Titles. Mr. Viart did much more than simply buff, wash, and paint cars, *cf. Brennan v. Bill Kirk's Volkswagen*, 497 F.2d 892, 893–94 (4th Cir.1974) (finding that an employee who primarily washed, cleaned, painted, and polished used cars, as well as ran various errands, did not qualify as exempt under § 213(b)(10)(A), and relying on the applicable regulation), and he is therefore a mechanic within the exemption. Accordingly, Bull Motors' motion for a Rule 50 judgment on Mr. Viart's overtime claim [D.E. 111] is GRANTED.[3]

---

**3.** In light of this ruling, Mr. Viart's motion for an award of liquidated damages on his over-time claim [D.E. 113] is DENIED.

# QUALITY CARE

PRE-DELIVERY
SERVICE RECORD
FORD
(EXCLUDING
ELECTRIC
VEHICLE)

CHECK/INSPECT THE VEHICLE
AS SHOWN: PERFORM
SPECIFIED ADJUSTMENTS AS
REQUIRED. REFER TO THE
PRE-DELIVERY INSPECTION
MANUAL (ELECTRIC VEHICLE
FORMS ARE CONTAINED IN
THE ELECTRIC VEHICLE
SERVICE MANUAL.)

'0x 4

## CHECK

Manual Released

- A1 Battery state of charge. Recharge if indicators is red. Batteries without the indicator — recharge if at 12.4 volts,or below.
- A2 Battery cables for tightness and proper assembly
- A5 Lines for leaks, damage and routing:
  - Brakes
  - Engine coolant and oil
  - Clutch
  - Exhaust
  - Fuel
  - Steering
  - Transmission cooling
  - Air-conditioning
- A6 Steering gear, steering linkage, flex coupling and suspension for damaged or loose fasteners and missing parts.
- A7 Turn manual shut-off valve to "OPEN" position (Gaseous Fuel Vehicles, if equipped with valve).

## CHECK AND FILL TO SPECIFICATION

- B1 TIRE PRESSURE (including spare)
- B2 Engine oil (Do not over fill)
- B3 Windshield and rear washer reservoirs
- B4 Engine cooling system (cold)
- B5 Power steering (hot)
- B6 Brake master cylinder
- B8 Clutch master cylinder
- B10 Automatic transmission/transaxle. Do not add/remove cold. (Do not over fill)

## REMOVE

- C1 Solid front axle leaf spring spacers
- C3 Rear shipping tie-down brackets — Taurus
- C4 Rotor protection bags (if installed)
  - Keep bags on until delivery

## INSTALL LOOSE-SHIPPED ITEMS

- D4 Loose accessories (including fuses removed for vehicle transport).

Note Do not use impact wrench to install locking lug nuts.

## TORQUE TO SPECIFICATION

- E1 Truck wheel nuts (light truck — rear dual wheels only)

Ford Customer Service Division
FCS-12081-00
To Reorder Forms Call 1-800-622-4511

Copyright © 1994, Ford Motor Company    June 1999    Litho in U.S.A.

## CHECK OPERATION

Manual Released

- F2 Safety belts
- F3 Seatback latches
- F6 Lights
  - Headlamps
  - Taillamps
  - Turn signals
  - Hazard warning flashers
  - Marker lamps
  - Courtesy lamps
  - Fog lamps (if equipped)
  - Instrument warning indicators
  - Air bag readiness light
- F7 Instruments for proper operation
- F8 Check Air Suspension warning light. Turn switch to "ON" position (Explorer/Expedition).
- F9 Parking brake (including warning lamp)
- F12 Steering column lock
- F13 Starter lockout — Attempt to start engine with:
- F14 Selector in forward and reverse gears (automatic trans.)
  - Clutch not depressed and selector in neutral (manual trans.)
- F15 Horn
- F16 Wipers and washers
- F17 Radio/clock operation and set stations/time
  - CONTOUR — reset clock mode to 12-hour (non-military) time mode.
- F18 Tripminder®/Message Center
- F19 Set compass variation zone
- F20 Heater, air conditioner, defroster, ventilation and electric coolant fan systems
- F21 Safety belt warning system

## ROAD TEST

- H1 Check driveability during road test. If a problem exists or if the "check engine/service engine soon" light illuminates, perform appropriate diagnosis and warranty repair per PC/ED manual
- H2 Throttle operation and idle return
- H3 Check for squeaks, rattles, vibrations and wind noise
- H5 Brakes (including parking brake)
- H6 Steering control and check clear vision
- H8 Transmission and clutch performance
- H10 Speed control
- H12 Transfer case

## APPEARANCE OPERATIONS

- AP1 Wash vehicle and perform detailed cleanup of interior, exterior and apply tire protectant.
- AP2 Inspect for interior and exterior metal and paint damage and touch up as required.
- AP3 Place necessary warranty facts booklet, owner card and owner publications in vehicle.
- AP4 Remove protective covers (body, seats and carpet).

## OWNER CARD AND DEALER INFORMATION

OWNER'S NAME

ADDRESS

CITY _____ STATE _____ ZIP CODE

DEALERSHIP'S NAME

ADDRESS

CITY _____ STATE _____ ZIP CODE

VEHICLE IDENTIFICATION NUMBER (VIN)

IGNITION KEY NO. _____ TRUNK KEY NO.

STOCK NO.

The undersigned authorized dealership representative certifies that this vehicle has been thoroughly inspected and that all emission compliance require-ments and other operations have been performed by a service technician in accordance with the service record for this vehicle, shop manual procedures and applicable dealer instructions.

I understand it is a Ford Motor Company Sales and Service Agreement requirement that this record be retained in the dealership service file for this vehicle.

TECHNICIAN'S SIGNATURE _____ DATE

DEALERSHIP AUTHORIZED SIGNATURE _____ DATE

## QUALITY CONCERNS REPORTING

If product quality concerns are noted during the pre-delivery of this unit:

- Call 1-800-322-5621
- FAX a report to 1-800-329-3377 (for report forms call 1-800-322-5621)
- Or fill out an Electronic Dealer Service Report (E.D.S.R.)

Note: Some items may not apply to your particular vehicle.

*Check items are not shown in the order they should be performed.

PDFPV2